FAIRFIELD STEAMSHIP CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ATLANTC COAST SHIPPING COMPANY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 1471, 1472.   Promulgated August 7, 1945.

*Frank V. Barns, Esq.*, and *Winthrop O. Cook, Esq.*, for the petitioners.

*William F. Evans, Esq.*, for the respondent.

569

OPINION.

DISNEY, *Judge*: The first question propounded to us is simple: Was sale of the *Maine* made by Fairfield, or by Atlantic after acquisition of this ship by liquidation of Fairfield? In our opinion it was made by Fairfield and the agreed gain was properly taxed to that corporation. This conclusion we consider proper under *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, another effort to shift to stockholders the gain from sale of corporate property. Though recognizing the right of the taxpayer to consider tax consequences, we must and do scrutinize the reality of what happened in the facts presented to us.

The petitioner (with the burden of proof) seeks to establish a lack of connection between what took place while Fairfield owned the *Maine* and the transfer of the ship after liquidation to Atlantic, along the line of some cases which have recognized such distinction. Thus, the dissent in *Court Holding Co.* v. *Commissioner*, 143 Fed. (2d) 823, recognizes that there may be "complete abandonment by the corporation of its purpose to sell and renewal of negotiations followed by a sale by the stockholders." In *Commissioner* v. *Falcon*, 127 Fed. (2d) 277, holding the corporation not liable for tax on gain from sale made by its stockholders the court held, to use the words of *Meurer Steel Barrel Co.* v. *Commissioner*, 144 Fed. (2d) 282, "that the acts in that case were unrelated and not part of an anticipatory plan." We may not, however, fairly come to the same conclusion here. Passing over the one change in the contract (clause 9 above set forth in the facts), consisting of a condition imposed by the United States Maritime Commission as to nonbelligerent use of the ship, accepted by both parties, for we consider such change immaterial, the sale effected was in substance that which had been arranged while Fairfield held title to the ship. That there is here involved no sale by Atlantic, unrelated to what had been done by Fairfield, but one "part of an anticipatory plan," is well shown by the fact that when, on September 19, 1940, Atlantic voted to authorize sale of the *Maine*, Lewis (who had obtained the offer from the British interests) was authorized to negotiate a contract of sale "to a prospective British purchaser, at a purchase price of $50. per deadweight ton; and * * * to sell the vessel with transfer of flag to British registry." Plainly, the sale was no new matter when Atlantic entered the picture.

Petitioner, on brief, points out that Pendleton, instructed by Lewis, advised Lambert, on September 18, that the price "would be acceptable when the vessel was transferred to Atlantic * * *." Though the language goes on to state that Pendleton could not deal with Fairfield, nevertheless it thus appears plain that (except for immaterial details) the offer was satisfactory and would be consummated by sale after a transfer of title. It is noteworthy that previous rejections of offers had been on the ground of price, which price was now satisfactory, showing that a deal had now been agreed upon—except for acquiring the property from some one else—indicating, we think, that Atlantic was made a conduit for Fairfield for that purpose.

It is to be noted also that, in the words of petitioner's reply brief, the "$50.00 a ton offer was accepted by Atlantic," following the transfer to it, yet no evidence appears that any offer was ever made *to Atlantic*, or substantially other than as submitted while Fairfield was holder of title. Atlantic was not in the business of selling ships, but was in the business of stevedoring. In fact, it never, prior to acquisition of the *Maine*, owned any ship. All of the facts convince us that this is a case of conduit utilized by the original owner, Fairfield, to route the property to the purchaser after an arrangement so complete as to be considered by the purchaser as binding. Under such facts, and after the expression of the Supreme Court in the *Court Holding Co.* case,[3] *supra*, that lack of execution of contract by the corporation (Fairfield) is unimportant; if the sale was in substance the sale of the corporation (Fairfield), we may not give effect to the contention that no firm offer was accepted by Fairfield. We think it was accepted in substance by Fairfield by its conduit Atlantic, if not earlier. Lewis, the same man who governed the matter in accepting for Atlantic, governed the rejection (in effect only until after the transfer) by Fairfield. Such a rejection amounted, in substance, to acceptance, except that another (the conduit or nominee Atlantic) would carry out the agreement. Pendleton's testimony that "the offer would be acceptable when the vessel was transferred to the Atlantic

---

[3] * * * The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. [Citing in a footnote: *Gregory* v. *Helvering*, 293 U. S. 465; *Minnesota Tea Co.* v. *Helvering*, 302 U. S. 609; *Griffiths* v. *Commissioner*, 308 U. S. 355; *Higgins* v. *Smith*, 308 U. S. 473.] To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

It is urged that respondent corporation never executed a written agreement, and that an oral agreement to sell land cannot be enforced in Florida because of the Statute of Frauds, Comp. Gen. Laws of Florida, 1927, vol. 3, Sec. 5779. But the fact that the respondent corporation itself never executed a written contract is unimportant, since the Tax Court found from the facts of the entire transaction that the executed sale was in substance the sale of the corporation. * * *

Coast Shipping Company," even though followed by a statement that the speaker could not deal or accept for Fairfield, in our opinion indicates clearly the unreality in the contention advocated by the petitioner. The transaction was merely, as a matter of form, completed by Atlantic.

Unreality is further suggested, we think, by the fact that, though Atlantic, under petitioner's theory, received the ship in liquidation on September 23, 1940, and then sold it, the other property, including about $107,000 in cash, of Fairfield was not transferred to Atlantic until December 27, 1940, so that the liquidation, and apparently the cancellation of the stock held by Atlantic, was, in fact, not consummated until that time—long after disposition of the ship to the British interests. Since, under the provisions of Fairfield's resolution to liquidate, "all of its assets" were to be transferred to Atlantic "in exchange for all the outstanding stock of Fairfield Steamship Corporation," the stock held by Atlantic was apparently not canceled until December 27, 1940, and Atlantic is seen dealing with a ship to which it had not, in fact, acquired a right.

In addition to the above cases, see *Embry Realty Co.* v. *Glenn*, 116 Fed. (2d) 682; *R. G. Trippett*, 41 B. T. A. 1254; affd., 118 Fed. (2d) 764; *S. A. MacQueen*, 26 B. T. A. 1337; affd., 67 Fed. (2d) 857; *Liberty Service Corporation*, 28 B. T. A. 1067; affd., 77 Fed. (2d) 94; *Hellebush* v. *Commissioner*, 65 Fed. (2d) 902; affirming 24 B. T. A. 660. We consider *George T. Williams*, 3 T. C. 1002, distinguishable upon the facts. The New York Statute, section 20, Stock Corporation Law (providing in substance that a stock corporation may sell assets with the consent of the holders of two-thirds of the shares), has no bearing, either in law or logic, upon the power of Fairfield to make the contract. It had only one stockholder. *In re Steinberg's Estate*, 274 N. Y. S. 914.

We conclude and hold that the Commissioner did not err in adding the profit upon sale of the *Maine* to the income of Fairfield.

Our decision on the first question renders it unnecessary to consider the second question—namely, whether the stock of Cuban owned by Atlantic became worthless in 1940—because that question is now moot, due to the fact that Atlantic was dissolved in December 1940 and that, with the elimination of the gain derived from the sale of the *Maine* from Atlantic's income for 1940, Atlantic's only other income for 1940 ($325) is offset by other uncontested deductions for the same period ($105,066.49).

Reviewed by the Court.

> *Decision will be entered in Docket No. 1471 (Fairfield) for the respondent, and decision of no deficiency will be entered in Docket No. 1472 (Atlantic).*

ARUNDELL, *J.*, dissenting: I am unable to agree with the majority in their disposition of this proceeding. The crucial question here is whether the Fairfield Corporation negotiated the sale and actually entered into a contract to sell the steamship *Maine*. If this was so and Fairfield transferred the *Maine* to Atlantic, which consummated the transaction, then the sale was that of Fairfield and Atlantic was a mere conduit of title. *Commissioner* v. *Court Holding Co., supra*, upon which the majority rely, would then be in point and the intermediate transfer could be disregarded as a "formal device" unnecessary to the consummation of the transaction. The rationale of that and other similar cases is that, when the stockholders take title after the corporation has bound itself to sell the property, they can do nothing but carry out the corporate obligations.

The situation in the instant case is entirely different from that involved in the *Court Holding Co.* case, *supra*. Early in 1940 one of the stockholders of Atlantic indicated that she would like to get her money out and at that time plans were made for the eventual liquidation of Atlantic. The evidence is clear that the parties had decided to transfer the assets of Fairfield, including the steamship *Maine*, to Atlantic in exchange for all of Fairfield's outstanding capital stock. Atlantic was to sell the *Maine*. It was decided to put the above plan into effect at a formal meeting to be held September 19, 1940. In September Lewis, who was the owner of 51 percent of the outstanding capital stock of Atlantic, which in turn owned all the stock of Fairfield, asked Pendleton to see what kind of offer he could get for the *Maine*. Pendleton knew that any sale of the *Maine* would be made by Atlantic, not Fairfield. When the offer of $50 per deadweight ton was received on September 18, 1940, Pendleton told Lambert that the price was right, but that nothing could be done until the vessel had been transferred to Atlantic and that he was not authorized to accept on behalf of Fairfield. While Lambert advised Rees that the offer was accepted, nowhere in the record does it appear that he had authority to bind Fairfield to such contract.

It is clear that Lewis' activities were, and were intended to be, in behalf of Atlantic, and it was only on September 19, after the transfer of the *Maine* to Atlantic, that Lewis, as president of Atlantic, was authorized to conclude a contract for the sale of the *Maine*. Lambert's action was thus, in effect, approved only by Atlantic and never by Fairfield. Fairfield was never under a contract to sell the *Maine* to the British Government. I think the profits from the sale in question are taxable only to Atlantic. The principle here is the same as in *George T. Williams*, 3 T. C. 1002, and *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14, and I think a similar treatment should be here accorded. I respectfully dissent.

VAN FOSSAN and MURDOCK, *JJ.*, agree with this dissent.